MATT O'MALLEY (SBN 272802)
PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
2825 Dewey Rd # 207
San Diego, CA 92106
Ph: 619-758-7743
Email: matt@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> PALOMAR TRANSFER STATION, INC., a California corporation, and COAST WASTE MANAGEMENT, INC., a California corporation, <br><br> Defendants. | Civil Case No. **'19CV0957 JM   LL** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br><br> **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*.)** |

Complaint

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.    On May 3, 2019, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Palomar Transfer Station, Inc. ("Palomar") and Coast Waste Management, Inc. ("CWM"), as owners and/or operators of the Palomar Transfer Station ("PTS") Facility located at 5960 El Camino Real, Carlsbad, California 92008, regarding violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*) ("General Industrial Permit"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit A and incorporated herein.

3.    Plaintiffs also sent the Notice Letter to the registered agents for Defendants as required by 40 C.F.R. § 135.2(a)(2), the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Board as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

4.    More than sixty (60) days have passed since the Notice Letter was served on Defendants and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is

diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5. Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.   <u>INTRODUCTION</u>

6. Plaintiffs seek relief for Defendants' substantive and procedural violations of the General Industrial Permit and the Clean Water Act resulting from Defendants' activities at the PTS Facility.

7. Specifically, Defendants have discharged and continue to discharge polluted storm water from the PTS Facility to downstream waters including Canyon De Las Encinas Creek, Agua Hedionda Creek, Agua Hedionda Lagoon, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1301, 1342, and of the General Industrial Permit. Defendants have also violated and continue to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Industrial Permit.

8. With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations like those conducted at the PTS Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

9. Among these Receiving Waters are ecologically sensitive areas providing essential habitat for fish, crabs, and hundreds of species of marine life, waterfowl, amphibians, reptiles, and mammals, including an array of threatened and endangered species. Portions of Agua Hedionda Lagoon and Agua Hedionda Creek are set aside as a California State Ecological Reserve which consists of multiple types of unique habitats including marshlands, intertidal mudflats, upland plant communities, and subtidal regions. The lagoon itself is a distinctive and precious natural resource as it not only

serves as home for numerous species, but also as a much needed respite for migrating birds, and a facility for boating and other recreation.

10.     Storm water and non-storm water contaminated with sediment, heavy metals, pathogens, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

11.     The polluted discharges from the PTS Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Coastkeeper's and CERF's members. The public's use of the Receiving Waters for water contact sports exposes people to bacteria, toxic metals, and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to these waters.

12.     Plaintiffs seek a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendants' repeated and ongoing violations of the Clean Water Act and the General Industrial Permit.

### III.     PARTIES

**A.     Plaintiffs.**

13.     Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 2825 Dewey Road, Suite 207, San Diego, California 92106.

14.     San Diego Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation. Coastkeeper implements this

mission through outreach and education programs that work to prevent water pollution, as well as community activism, participation in governmental hearings, and prosecuting litigation to ensure that San Diego's beaches, bays, coastal waters, and tributary streams and rivers meet all substantive water quality standards guaranteed by Federal, State and local statutes and regulations. When necessary, Coastkeeper directly initiates enforcement actions on behalf of itself and its members.

15.    Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located at 1140 South Coast Highway 101, Encinitas California, 92024.

16.    CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

17.    Plaintiffs have thousands of members who live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy Canyon De Las Encinas Creek, Agua Hedionda Creek, Agua Hedionda Lagoon, and the Pacific Ocean to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies, among other activities.

18.    Defendants' failure to comply with the procedural and substantive requirements of the General Industrial Permit and the Clean Water Act results in discharges of polluted storm water to the Receiving Waters. Defendants' polluted discharges degrade water quality and harm aquatic life in the Receiving Waters, and thus impair Plaintiffs' members' use and enjoyment of those waters.

19.    The violations of the General Industrial Permit and Clean Water Act at the PTS Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the General Industrial Permit and the Clean Water Act.

Complaint                                4

20.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendants' activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

**B.     The Owner and/or Operator of the PTS Facility.**

21.     Plaintiffs are informed and believe that Palomar Transfer Station, Inc. is an active California corporation and its registered agent is CT Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

22.     Plaintiffs are informed and believe that Coast Waste Management, Inc. is an active California corporation and its registered agent is likewise CT Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

23.     Plaintiffs are informed and believe that Palomar leases the PTS Facility located at 5960 El Camino Real, Carlsbad, California, 92008, and subleases a portion of the PTS Facility to CWM.

24.     Plaintiffs are informed and believe that Palomar operates a waste transfer station and storage area at the PTS Facility,

25.     Plaintiffs are informed and believe that CWM operates a recycling buy back center, maintenance building, overnight truck and/or equipment parking lot, and storage area at the PTS Facility.

26.     Plaintiffs are informed and believe that Palomar and CWM are the Owners and/or Operators of the PTS Facility.

**IV.     LEGAL BACKGROUND**

**A.     The Clean Water Act.**

27.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by a NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

28.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies

Complaint                                                    5

with various enumerated Sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

29.    "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

30.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); 40 C.F.R. § 122.2.

31.    The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

32.    The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

33.    A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

34.    A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-01.

35.    Section 301(b) requires that, by March 31, 1989, all point source

dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

36.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1), 1365(f).

37.     The PTS Facility is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

38.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. 33 U.S.C. § 1365(a).

39.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring between January 28, 2009 and November 2, 2015, and $54,833 for violations occurring after November 2, 2015. 33 U.S.C. § 1319(d); 40 C.F.R. §19.4 (establishes the Adjustment of Civil Monetary Penalties for Inflation for violations of 33 U.S.C. § 1319(d)).

40.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing, or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.      California's General Industrial Permit.**

41.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

42.     Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. 33 U.S.C. § 1342(b).

43.     States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *Id.*

44.     California is a state authorized by the EPA to issue NPDES permits.

45.     In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

46.     The General Industrial Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. 33 U.S.C. § 1342.

47.     Between 1997 and June 30, 2015, the General Industrial Permit in effect was Order No. 97-03-DWQ ("1997 Permit").

48.     On July 1, 2015, pursuant to Order No. 2014-0057-DWQ ("2015 Permit"), the reissued General Industrial Permit took effect.

49.     The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit.

50.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the General Industrial Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, Finding 2; 2015 Permit § I.A.12.

51.     Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Industrial Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. 1997 Permit, Finding 3; 2015 Permit § I.A.17.

52.     Violations of the General Industrial Permit are violations of the Clean Water Act. 1997 Permit § C.1; 2015 Permit § XXI.A.

**C.      The General Industrial Permit Discharge Prohibitions and Effluent Limitations.**

53.      The General Industrial Permit contains certain absolute prohibitions. The Discharge Prohibitions provisions prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by a NPDES permit, to the waters of the United States. 1997 Permit § A.1; 2015 Permit § III.B. These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. 1997 Permit § A.2; 2015 Permit § III.C.

54.      The General Industrial Permit Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 1997 Permit § B.3; 2015 Permit § V.A.

55.      Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

56.      Pursuant to the CWA and the General Industrial Permit, dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

57.      The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

58.      The EPA Benchmarks provide a relevant and objective standard for

evaluating whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); *see also* 2015 MSGP Fact Sheet at 50; EPA 2008 MSGP Fact Sheet at 106.

59.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Id.*

60.     The EPA Benchmarks are: 0.68 mg/L for N+N; 100 mg/L for TSS; 1.0 mg/L for iron; .12 mg/L for zinc and .082 mg/L for lead based on 100mg/L hardness. 2015 MSGP Fact Sheet at 55-56.

61.     Failure to develop and/or implement BMPs that constitute BAT and BCT is a violation of the General Industrial Permit. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

**D.     The General Industrial Permit Receiving Water Limitations.**

62.     The General Industrial Permit Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater from adversely impacting human health or the environment. 1997 Permit § C.1; 2015 Permit § VI.B.

63.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the General Industrial Permit's Receiving Water Limitations. *Id.*

64.     The General Industrial Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. 1997 Permit § C.2; 2015 Permit § VI.A.

65.     Water Quality Standards ("WQS") are pollutant concentration levels

determined by the State Board, the various Regional Boards, and the EPA to be protective of the Beneficial Uses of the waters that receive polluted discharges.

66.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan that contains WQSs for water bodies within its geographical area.

67.     WQSs applicable to dischargers covered by the General Industrial Permit include, but are not limited to, those set out in the Water Quality Control Plan for the San Diego Basin, California Regional Water Quality Control Board, San Diego Region ("Basin Plan"), and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

68.     The CTR includes numeric criteria set to protect human health and the environment in the State of California. *See* Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), *available at* http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

69.     The CTR sets forth maximum concentration levels of several toxic pollutants such that California can achieve health and environmental protection goals.

70.     The CTR sets forth the following maximum concentrations for freshwater inland surface waters, based on 100mg/L hardness: lead – .065 mg/L; zinc – .12 mg/L; copper – .013 mg/L. 40 C.F.R. § 131.38.

71.     The CTR maximum allowable continuous concentrations for freshwater inland surface waters for selenium is 0.005 mg/L. *Id*.

72.     The Basin Plan identifies "Beneficial Uses" for water bodies in the San Diego region.

73.     Beneficial Uses for surface waters are designated under the Clean Water Act section 303 in accordance with regulations contained in 40 C.F.R. § 131.10. The State is required to specify appropriate water Beneficial Uses to be achieved and protected. Basin Plan, at 2-2.

74.     The Beneficial Use designation of surface waters of the state must take into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial and other purposes including navigation. *Id.*

75.     The existing and potential Beneficial Uses for Canyon De Las Encinas Stream downstream of the point at which it could potentially receive storm water discharges from the Facility include: Non-Contact Water Recreation; Warm Freshwater Habitat; and Wildlife Habitat. Canyon De Las Encinas Stream also has a Potential Beneficial Use as Water Contact Recreation. Basin Plan at Table 2-2.

76.     The Beneficial Uses for the Agua Hedionda Creek downstream of the point at which it receives storm water discharges from the Facility include: Water Contact Recreation; Non-Contact Water Recreation; Warm Freshwater Habitat; Wildlife Habitat; Preservation of Biological Habitats of Special Significance; Municipal and Domestic Supply; Agricultural Supply; and Industrial Service Supply. *Id.*

77.     The existing and potential Beneficial Uses for Agua Hedionda Lagoon are: Industrial Service Supply; Water Contact Recreation; Non-Contact Water Recreation; Commercial and Sport Fishing; Aquaculture; Estuarine Habitat; Marine Habitat; Wildlife Habitat; Preservation of Biological Habitats of Special Significance; Rare, Threatened, or Endangered Species; Migration of Aquatic Organisms; Spawning, Reproduction, and/or Early Development; and Shellfish Harvesting. *Id.*

78.     The Beneficial Uses for the Pacific Ocean include: Industrial Service Supply, Navigation, Contact Water Recreation, Non-Contact Water Recreation, Commercial and Sport Fishing, Wildlife Habitat, Preservation of Biological Habitats of Special Significance, Marine Habitat, Migration of Aquatic Organism, Spawning Reproduction, and/or Early Development, Shell Harvesting, Aqua Culture, and Rare, Threatened, or Endangered Species. *Id.*

79.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of

the Clean Water Act, 33 U.S.C. § 1313(d).

80. According to the 2016 303(d) List of Impaired Water Bodies, Agua Hedionda Creek is impaired for enterococcus, fecal coliform, manganese, phosphorus, selenium, total dissolved solids, total nitrogen (as N), and toxicity. *See* 2014/2016 California Integrated Report – All Assessed Waters, *available at* http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml (last accessed on March 21, 2019).

81. According to the 2016 303(d) List of Impaired Water Bodies, Agua Hedionda Lagoon is impaired for toxicity. *Id.*

82. Polluted discharges from industrial facilities, such as the PTS Facility, contribute to the degradation of these already impaired surface waters, as well as aquatic-dependent wildlife.

83. The Basin Plan sets forth WQSs for surface waters and enclosed bay and estuaries for, among other things: total dissolved solids, floating material, O&G, pH, settleable matter, suspended materials, iron, phosphorus, manganese, and toxic substances.

84. The Basin Plan Objective for total iron is 0.3 mg/L for Agua Hedionda Creek. Basin Plan Table 3-2.

85. The Basin Plan Objective for manganese is 0.005 mg/L for Agua Hedionda Creek. *Id.*

86. The Basin Plan Objective for total phosphorus is 0.1 mg/L in order to prevent plant nuisances in streams and other flowing waters, including Agua Hedionda Creek. *Id.*

87. The Basin Plan Objective for Total Dissolved Solids ("TDS") is 500 mg/L for Agua Hedionda Creek. *Id.*

88. The Basin Plan Objective for enterococcus is 61 MPN/100 mL for Agua Hedionda Creek. *Id.*

89. The Basin Plan Objective for fecal coliform states that the "concentration

shall not exceed 400 organisms per 100 ml for more than 10 percent of the total samples during any 30-day period" for freshwater water bodies with a Beneficial Use of contact recreation. *Id*. at 3-7.

90.　The Basin Plan Objective for hydrogen ion concentration ("pH") states that "the pH shall not be depressed below 6.5 nor raised above 8.5" in inland surface waters. *Id*. at 3-26.

91.　Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

92.　In adopting the CTR, the EPA expressly directed that "[a]ll waters (including lakes, estuaries and marine waters) … are subject to the Criteria promulgated today. Such criteria will need to be attained at the end of the discharge pipe, unless the State authorizes a mixing zone."  65 F.R. § 31682-01, 31701.

93.　Similarly, the Basin Plan provides that absent any "allowance for dilution," waste discharges are prohibited unless "the quality of the discharge" meets its Criteria. Basin Plan at 4-19.

94.　Because the General Industrial Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the General Industrial Permit. See 1997 Permit § C.2; 2015 Permit § VI.A; *see also Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 926 (C.D. Cal. 2009).

95.　"'Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for [an] enforcement action.' [Citation]." *Natural Resources Defense Council, Inc.* ("*NRDC*") *v. County of Los Angeles,* 725 F.3d 1194, 1204 (9th Cir. 2013).

96.　The General Industrial Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS, it is a

separate and distinct violation of Receiving Water Limitation § C.2 of the 1997 Permit, Receiving Water Limitation § VI.A of the 2015 Permit, and § 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

97.     Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation § C.1 of the 1997 Permit, Receiving Water Limitation § VI.B of the 2015 Permit, and § 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

**E.     The General Industrial Permit Storm Water Pollution Prevention Plan Requirements**

98.     Section A.1.a and Provision E.2 of the 1997 Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Industrial Permit. Sections X.A-B of the 2015 Permit require development and implementation of site-specific SWPPPs by July 1, 2015 or upon commencement of industrial activity.

99.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit § A.2; 2015 Permit § X.

100.    The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 1997 Permit § A.2; 2015 Permit § X.G.

101.    The SWPPP must identify site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. 1997 Permit § A.2; 2015 Permit § X.H.

102.    The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT, and as necessary to comply with the General Industrial

Permit. 1997 Permit § A.2; 2015 Permit §§ I.D.32, X.C.

103.   The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan, also referred to as a Monitoring and Reporting Plan. 1997 Permit §§ A.1-10; 2015 Permit §§ X.A-I.

104.   The General Industrial Permit requires the discharger to evaluate the SWPPP at least annually and revise it as necessary to ensure compliance with the General Industrial Permit. 1997 Permit §§ A.9-10; 2015 Permit §§ X.A.9, X.B.1. The 2015 Permit requires dischargers to "certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revision(s)." 2015 Permit § X.B.2.

105.   The General Industrial Permit requires dischargers to conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit §§ A.9.a-c; 2015 Permit § XV.

106.    Section A.9.d of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the General Industrial Permit. 1997 Permit §§ A.9.d.i-vi. If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the General Industrial Permit. *Id.* § A.9.d. The evaluation report shall be submitted as part of the Annual Report specified in § B.14 of the General Industrial Permit. *Id.*

107.    The SWPPP and site maps must be assessed and revised as necessary to ensure accuracy and effectiveness. 1997 Permit §§ A.1, B.3-4; 2015 Permit §§ I.J.55, X.B.1.

### F.    The General Industrial Permit Monitoring and Reporting Requirements.

108.    The General Industrial Permit requires permittees to develop and implement a monitoring and reporting program ("M&RP"). 1997 Permit §§ B.1-2, E.3; 2015 Permit, §§ X.I, XI.1.

109.    The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the General Industrial Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit §§ B.2.a-b; 2015 Permit §§ X.I, XI.

110.    The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 1997 Permit §§ B.2.a, B.2.d; 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43.

---

[1] The 2015 Permit refers to the M&RP as a Monitoring Implementation Plan or "MIP."

111.   The M&RP must ensure that storm water discharges are in compliance with the General Industrial Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit § B.2; 2015 Permit §§ I.J.55-56, XI.

112.   The M&RP shall be revised as necessary to ensure compliance with the General Industrial Permit. 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

113.   The General Industrial Permit requires dischargers conduct monthly visual observations of stormwater discharges, stormwater drainage areas, and for the presence of unauthorized non-storm water discharges. 1997 Permit § B.4.a (monthly observations of each discharge location required); 2015 Permit § XI.A.1 (monthly observations of each drainage area required).

114.   Section B.4.c of the 1997 Permit and Section XI.A.2 of the 2015 Permit require dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges, and to eliminate unauthorized non-storm water discharges. 1997 Permit § B.4.c; 2015 Permit § XI.A.3.

115.   The General Industrial Permit requires dischargers to revise the M&RP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit § B.4.c; 2015 Permit § X.B.1.

116.   The General Industrial Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit §§ B.5, B.7; 2015 Permit § XI.B.4.

117.   The 1997 Permit defines Wet Season as October 1-May 30. 1997 Permit, § B.4.a.

118.   Section B.5.a of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season

Complaint                                  18

and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. *Id.* Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled. *Id.*

119.    Section B.5.b of the 1997 Permit required sampling to occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

120.    Section B.15 of the 1997 Permit required dischargers participating in a group monitoring plan to collect at least two (2) samples from each discharge point at the Facility over a five (5) year period. *See* 1997 Permit §§ B.5, B.7, B.15.

121.    Section XI.B.1 of the 2015 Permit requires sampling from a qualifying storm event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area.

122.    The 2015 Permit defines Reporting Year as July 1 through June 30. 2015 Permit § I.M.62.b.

123.    Section XI.B.2 of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).

124.    Section XI.B.11 of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via California's Storm Water Multiple Application & Report Tracking System ("SMARTS") database within thirty (30) days of obtaining the results for each sampling event.

125.    Section B.5.c.i of the 1997 Permit required dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

126.   Section B.5.c.ii of the 1997 Permit further required dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

127.   Sections XI.B.6.a-b of the 2015 Permit requires dischargers to analyze samples for TSS, O&G, and pH.

128.   Section XI.B.6.c of the 2015 Permit requires dischargers to analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants on a facility-specific basis.

129.   Section XI.B.6.e of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads.

130.   Section B.14 of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include (1) a summary of visual observations and sampling results, (2) an evaluation of the visual observations and sampling and analysis results, (3) laboratory reports, (4) the annual comprehensive site compliance evaluation report specified in Section A.9, (5) an explanation of why a facility did not implement any activities required, and (6) the records specified in Section B.13.i. *Id.*

131.   Section C.11.d of the 1997 Permit requires facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit § C.11.d.

132.   Section XVI of the 2015 requires dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a

(1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year, as indicated in the Compliance Checklist, (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation. *Id.*

133.   The General Industrial Permit requires that all reports, certifications, or other information required by the Permit or requested by a regional board to have been signed by an authorized representative of the facility's operators. 1997 Permit § C.9; 2015 Permit § XX.K.

134.   The General Industrial Permit requires that signatories under Sections C.9-10 of the 1997 Permit, and Sections XX.K-L of the 2015 Permit, to make the following certification: "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

**G.     The 2015 Permit Exceedance Response Actions Requirements.**

135.   The 2015 Permit includes Numeric Action Levels ("NALs") that are based on EPA Benchmarks. Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." 2015 Permit § I.M.61; § I.M.62 and Table 2.

136.   When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." 2015 Permit § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id.* § XII.C.

137.   Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred. *See Id.* § XII.C. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of General Industrial Permit ("Level 1 Evaluation"). *Id.* §§ XII.C.1.a-c.

138.   Although the Level 1 Evaluation may focus on the drainage area(s) where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *Id.* § XII.C.1.c.

139.   Based upon the Level 1 Evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the Level 1 Evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the summary of the Level 1 ERA Evaluation, and a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL. *Id.* §§ XII.C.2.a.i-ii.

140.   The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *Id.* § XII.C.2.a.iii.

141.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *Id.* § XII.C.2.b.

142.   A discharger's Level 1 status for any given parameter changes to Level 2

status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the Reporting Year during which the NAL exceedance(s) occurred. *Id.* § XII.D.

143.   Dischargers with Level 2 status shall certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the Reporting Year during which the NAL exceedance(s) occurred. For each new Level 2 NAL exceedance, the Level 2 Action Plan must identify which of the demonstrations in subsection D.2.a through c the Discharger has selected to perform. A new Level 2 NAL exceedance is any Level 2 NAL exceedance for 1) a new parameter in any drainage area, or 2) the same parameter that is being addressed in an existing Level 2 ERA Action Plan in a different drainage area. *Id.* § XII.D.1.a.

144.   The Discharger shall certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) if this information has changed since previous certifications. *Id.* § XII.D.1.b.

145.   The Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. *Id.* § XII.D.1.c.

146.   All elements of the Level 2 ERA Action Plan shall be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 ERA Action Plan. *Id.* § XII.D.1.d.

147.   The Level 2 ERA Action Plan shall include a schedule and a detailed description of the tasks required to complete the discharger's selected demonstration(s) as described in subsections D.2.a through c of the 2015 Permit. *Id.* § XII.D.1.e.

148.   On January 1 of the Reporting Year following the submittal of the Level 2 ERA Action Plan, a discharger with Level 2 status shall certify and submit a Level 2 ERA Technical Report prepared by a QISP that includes one or more of the following demonstrations: (a) Industrial Activity BMPs Demonstration, (b) Non-Industrial Pollutant Source Demonstration, or (c) Natural Background Pollutant Source Demonstration. *Id.* §§

XII.D.2.a-c.

149.   NAL exceedances as defined in the General Industrial Permit are not, in and of themselves, violations of the General Industrial Permit. However, NAL exceedances indicate that a facility is performing poorly and failing to implement BMPs that achieve BAT and BCT.

150.   A "[d]ischarger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit."  *Id.* § I.M.63.

## IV.   **FACTUAL BACKGROUND**

### A.   **Facility Site Information and Description of Industrial Activities.**

151.   Plaintiffs are informed, believe, and thereon allege that Defendants first obtained General Industrial Permit coverage to conduct industrial operations at the Facility on April 6, 1992.

152.   Plaintiffs are informed, believe, and thereon allege that CWM first obtained General Industrial Permit coverage to conduct industrial operations at the PTS Facility on July 10, 1998.

153.   Plaintiffs are informed, believe, and thereon allege that Palomar submitted its most recent Notice of Intent ("NOI") to the State Board to obtain General Industrial Permit coverage for the PTS Facility on May 4, 2015 ("Palomar 2015 NOI"), under Waste Discharge Identification ("WDID") Number 9 37I018454.

154.   Plaintiffs are informed, believe, and thereon allege that CWM submitted its most recent NOI to the State Board to obtain General Industrial Permit coverage for the PTS Facility on June 1, 2018 ("CWM 2018 NOI"), under WDID 9 37I014374.

155.   The Palomar 2015 NOI identifies the operator of "Palomar Transfer Station" site located at 5960 El Camino Real, Carlsbad, CA 92008 as "Palomar Transfer Station Inc."

156.   The CWM 2018 NOI identifies the operator of "Coast Waste Mgt Inc" site located at 5960 El Camino Real, Carlsbad, CA 92008 as "Coast Waste Management Inc."

157.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility is currently an active industrial facility covered under the General Industrial Permit, at which industrial operations have been and continue to be conducted by both Palomar and CWM.

158.   The Palomar 2015 NOI states that the Facility is 7 acres, with 7 acres of industrial area exposed to storm water, but does not indicate what percent of the site is impervious.

159.   The Palomar SWPPP dated November 2016 and signed on March 3, 2017, ("Palomar 2016 SWPPP"), publicly available via the SMARTS database, states that the Facility is approximately 11 acres.

160.   The Palomar 2016 SWPPP states that the "amount of pervious surface (e.g., paved surfaces, structures) at the PTSI is greater than 90 percent."

161.   Palomar's previous SWPPP, dated November 2015 and signed on November 12, 2015 ("Palomar 2015 SWPPP"), publicly available via the SMARTS database, also states that the facility is 11 acres, but lists the site as over 90 percent *impervious*.

162.   The CWM 2018 NOI states that the Facility is 11 acres, with 11 acres of industrial area exposed to storm water, and only 1 percent impervious.

163.   The CWM SWPPP dated December 2016 ("CWM 2016 SWPPP"), publicly available via the SMARTS database, states that the Facility is approximately 11 acres, 70% of which is impervious.

164.   CWM's previous SWPPP, dated November 2015 ("CWM 2015 SWPPP"), publicly available via the SMARTS database, also states that the Facility is approximately 11 acres, 70% of which is impervious.

165.   Plaintiffs are informed, believe, and thereon allege that the NOIs and/or SWPPPs for both Palomar and CWM are inaccurate regarding the size and physical properties of the PTS Facility.

166.   Plaintiffs are informed, believe, and thereon allege the PTS Facility is bounded on western side by Orion Road. The northern portion of the facility is bounded

by Faraday Avenue. The facility is bounded on the south/southeast by the Carlsbad Oaks North Habitat Conservation Area. *See* CWM 2016 SWPPP, § 3.2.

167.   The Palomar 2015 NOI lists the Standard Industrial Classification ("SIC") code for the Facility as 4212 (Local Trucking Without Storage).

168.   Section 2.1.2 of the Palomar 2016 SWPPP also lists the SIC code as 4212.

169.   The CWM 2018 NOI lists the SIC codes for the Facility as 4212 (Local Trucking Without Storage) and 4214 (Local Trucking with Storage).

170.   Section 1.0 of the CWM 2016 SWPPP lists the primary SIC code as 4212 and the secondary SIC code as 4214.

171.   Plaintiffs are informed, believe, and thereon allege based on information available to Plaintiffs, including the CWM 2016 SWPPP and Palomar 2016 SWPPP describing vehicle and equipment maintenance and recycled materials processing and storage at the Facility, indicates that SIC code 4231 (Terminal & Joint Terminal Maintenance Facilities for Motor Freight Transportation), and SIC code 4953 (Refuse Systems) also apply to the Facility.

172.   SIC code 4953 facilities must obtain General Industrial Permit coverage for the entire facility.

173.   For facilities classified as SIC Code 4212, the General Industrial Permit requires permit coverage for "vehicle maintenance shops, equipment cleaning operations, or airport deicing operations." 1997 Permit, Attachment 1.

174.   The General Industrial Permit regulates the portions of the facility which are used for "vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication) or other operations identified herein that are associated with industrial activity." 1997 Permit Attachment 1; *see also* Attachment 4 (stating that "storm water associated with industrial activity" includes storm water discharges from material handling activities and storage areas for material handling equipment).

175.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility primarily provides waste and recyclable material pickup, processing, storage, and

1    handling, as well as support services for Republic Services. More specifically industrial

2    activities at the PTS Facility include "Waste Transfer, Recycling, Vehicle and Equipment

3    Maintenance, Vehicle and Equipment Fueling, Container Maintenance." Palomar 2016

4    SWPPP, § 2.1.2.

5        176.   Plaintiffs are informed, believe, and thereon allege that the industrial

6    activities at the Facility include but are not limited to: receiving solid waste, green waste,

7    and recyclable materials from off site; unloading solid waste, green waste, and

8    recyclables materials; handling of solid waste, green waste, and recyclables materials;

9    depositing, loading, and unloading municipal solid waste into trucks or containers;

10   hazardous materials handling and storage; recyclables staging areas and storage; vehicle

11   and equipment fueling, maintenance, repair, washing, and storage; bin maintenance,

12   welding, washing, and storage; vehicle fueling, maintenance, and washing; outdoor

13   materials storage; and parking. Information available to Coastkeeper and CERF indicates

14   that these activities occur throughout the Facility. *See* 2016 Palomar SWPPP.

15       177.   According to Section 3.2 of the CWM 2016 SWPPP, the facility includes

16   one main building, various storage areas, and parking areas. Waste collection vehicles are

17   parked on an unpaved area in the northern portion of the facility. "A recyclables buyback

18   center and household hazardous waste drop off center is located on the western portion of

19   the facility. Bins and containers are stored on the unpaved area on the southwestern

20   portion of the facility. Collection vehicle and container washing activities are conducted

21   on a wash rack located on the southern portion of the facility. Vehicle fueling is

22   conducted on the southeastern portion of the facility." CWM 2016 SWPPP § 3.2.

23       178.   The main building covers approximately 56,000 square feet. Activities

24   conducted by CWM inside this building include collection maintenance, welding, bin

25   container painting, and container repair activities. "The northeastern portion of the main

26   building also houses Republic's transfer operations." *Id*.

27       179.   Plaintiffs are informed, believe, and thereon allege that the areas of

28   industrial activity at the Facility include the transfer building and area, recyclables

Complaint                                27

storage area, vehicle maintenance area, bin storage area, truck maintenance area, bin repair area, bin wash area, truck wash area, vehicle and truck fueling areas, and parking areas.

180.   Plaintiffs are informed, believe, and thereon allege that storage, repair, fueling, and cleaning of vehicles, bins, and equipment; storage, handling, and management of materials associated with waste storage and transfer; and other industrial activities occur throughout the Facility outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and without secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the facility.

181.   Plaintiffs are informed, believe, and thereon allege that pollutants associated with the Facility's industrial activities have been and continue to be tracked throughout the entire site, where they accumulate at the storm water discharge points and the driveways leading to Orion Road. This results in trucks and vehicles tracking trash, recyclables, sediment, dirt, O&G, metal particles, and other pollutants off-site.

182.   According to Section 3.3 of the CWM 2016 SWPPP, "Stormwater from the adjoining Republic facility comingles with the stormwater from the CWM facility and primarily discharges from a Corrugated Metal Pipe outfall onto southern side of the CWM property." As noted *supra*, the Facility is bounded on the south/southeast by the Carlsbad Oaks North Habitat Conservation Area. *See* CWM 2016 SWPPP, § 3.2. Therefore, this outfall discharges polluted stormwater directly into the protected conservation area.

183.   Plaintiffs are informed, believe, and thereon allege that one or more of the regulated industrial activities is conducted at locations throughout the entire Facility, and thus the entire Facility requires General Industrial Permit coverage.

184.   Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout the entire facility, no BMPs or other controls exist to separate the storm water flows from portions of the

Complaint                                    28

Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

185.   Plaintiffs are informed, believe, and thereon allege that storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and thus all storm water discharges from the Facility are regulated under the General Industrial Permit.

186.   Plaintiffs are informed, believe, and thereon allege that industrial activities at the PTS Facility generate significant amounts of numerous pollutants, as described *infra*. During rain events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

187.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the General Industrial Permit. These illegal discharges of polluted storm water and non-storm water impact Coastkeeper and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

## B.   Description of Pollutants and Pollutant Sources Related to the Facility's Industrial Activities.

188.   Plaintiffs are informed and believe, and thereon allege, that the industrial activities and areas of industrial activity at the PTS Facility are pollutant sources.

189.   Plaintiffs are informed and believe, and thereon allege, that the pollutants associated with industrial activities at the PTS Facility include, but are not limited to: pH affecting substances; pathogens including coliform and enterococcus bacteria; metals such as iron, copper, lead, and zinc; TSS; gasoline and diesel fuels; fuel additives; coolants; antifreeze; transmission fluid; hydraulic fluid; waste oil; trash; nitrogen; phosphorus; and O&G.

190.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility

Owners and/or Operators have not properly developed and/or implemented the required BMPs to prevent the exposure of pollutants to precipitation, and the subsequent discharge of polluted storm water from the Facility during rain events.

191.   Plaintiffs are informed and believe, and thereon allege, that because the PTS Facility Owners and/or Operators have not properly developed and/or implemented the required BMPs, during rain events storm water carries pollutants from the Facility's main building, recyclables storage area, metal and household hazardous materials storage areas, vehicle maintenance area, bin storage area, truck maintenance area, bin repair area, bin wash area, truck wash area, vehicle and truck fueling areas, parking areas, and other areas where regulated industrial operations occur into the Receiving Waters, in violation of the General Industrial Permit.

192.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to develop and/or implement required BMPs to prevent discharges of non-storm water in violation of the General Industrial Permit and the Clean Water Act.

193.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have discharged and continue to discharge polluted storm water and non-storm water from the PTS Facility in violation of the General Industrial Permit.

194.   Plaintiffs are informed, believe, and thereon allege that the polluted storm water and non-storm water discharges from the PTS Facility cause and/or contribute to the impairment of water quality in Receiving Waters. Plaintiffs further allege that elevated levels of metals, pathogens, nutrients, sedimentation, and other pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

**C.     Facility Drainage Areas, Storm Water Flow, and Discharge Locations.**

195.   According to the Palomar 2016 SWPPP, the PTS Facility Owners and/or Operators report that the Facility consists of five drainage areas.

196.   Drainage Area 1 ("DA1") drains south and west toward SW-1 and then through a storm drain pipe towards a curb inlet on Orion Road. Palomar 2016 SWPPP, §

Complaint                                              30

2.1.4.

197.   Drainage Area 2 ("DA2") drains most of the main building and the area around it, directing the flow towards SW-2 and then through a storm drain pipe that discharges directly to the Carlsbad Oaks North Habitat Conservation Area to the south. *Id*.

198.   Drainage Area 3 ("DA3") drains east towards SW-3 and west into a trench drain and small basin (Drainage Basin 2), then via a subsurface pipe and overflow trench drain towards SW-3, then through a storm drain pipe that discharges directly to the Carlsbad Oaks North Habitat Conservation Area to the south. *Id*.

199.   Drainage Area 4 ("DA4") drains south towards a vegetated treatment swale (Drainage Basin 1) that discharges into Drainage Basin 2. *Id*.

200.   Drainage Area 5 ("DA5") is stated to be non-industrial and which drains south to an unsampled curb inlet on Orion Road. *Id*.

201.   Plaintiffs are informed, believe, and thereon allege that the points of egress/ingress to the facility include four (4) driveways leading to Orion Avenue, none of which is sampled.

202.   Plaintiffs are informed, believe, and thereon allege that the southern two driveways are fitted with trench drains that flow towards Drainage Basin 1 and Drainage Basin 2, but the northern two driveways are not fitted with any such BMPs to prevent, divert, or redirect storm water.

203.   According to the 2016 CWM SWPPP, the northernmost driveway leads directly to DA1, an area of industrial activity, and there is no trench drain or cattle grate to prevent run-in and run-off or track-in and track-out of pollutants to and from DA1 via this driveway. "The southwestern corner of the unpaved collection vehicle parking area and a portion of the paved driveway sheet flow to a catch basin with CDS unit and discharges off-site (SW-1). A small portion of public access road sheet flows west and discharges off-site via sheet flow." 2016 CWM SWPPP, § 3.3.

204.   Plaintiffs are informed, believe, and thereon allege that storm water and non-

1    storm water discharges from the Facility via SW-2 and SW-3 flow directly into the

2    Carlsbad Oaks North Habitat Conservation Area and into the Receiving Waters.

3        205.   Plaintiffs are informed, believe, and thereon allege that storm water and non-

4    storm water discharges from the Facility via SW-1 and the driveways flow into the City

5    of Carlsbad storm drain system. After the storm water enters the storm drains it is

6    discharged to the Receiving Waters.

7        **D.   The PTS Facility Discharges Contaminated Storm Water in Violation of**

8              **the General Industrial Permit.**

9        206.   Plaintiffs are informed, believe, and thereon allege that with every

10   significant rain event, the PTS Facility discharges polluted storm water via storm

11   drainage systems and into the Receiving Waters.

12       207.   Plaintiffs are informed, believe, and thereon allege that the Receiving

13   Waters into which the PTS Facility discharges polluted storm water are waters of the

14   United States and therefore the General Industrial Permit properly regulates discharges to

15   those waters.

16       208.   Plaintiffs are informed, believe, and thereon allege that storm water

17   discharges from the PTS Facility violates the Discharge Prohibitions, Effluent

18   Limitations, and the Receiving Water Limitations of the General Industrial Permit.

19       **1.  Discharges of Polluted Storm Water from the PTS Facility Violate**

20          **General Industrial Permit Effluent Limitations**

21       209.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility has

22   discharged and continues to discharge storm water containing pollutant concentration

23   levels above EPA Benchmarks without implementing BMPs that achieve BAT/BCT in

24   violation of Sections B.3 of the 1997 Permit, and V.A of the 2015 Permit.

25       210.   Plaintiffs are informed, believe, and thereon allege that storm water

26   discharged from the PTS Facility has exceeded the EPA Benchmark value for N+N. For

27   example, Defendants' monitoring data from January 31, 2019 for SW-1 indicates

28   exceedance levels of N+N at 1.77 mg/L, which is more than double the EPA Benchmark

1   value for N+N of 0.68 mg/L. MSGP Fact Sheet at 55-56.

2   211.   Plaintiffs are informed, believe, and thereon allege that storm water

3   discharged from the PTS Facility has exceeded the EPA Benchmark value for

4   phosphorus. For example, Defendants' monitoring data from January 31, 2019 for SW-2

5   indicates exceedance levels of phosphorus at 5.2 mg/L, which is more than double the

6   EPA Benchmark value for phosphorus of 2.0 mg/L. *Id.*

7   212.   Plaintiffs are informed, believe, and thereon allege that storm water

8   discharged from the PTS Facility has exceeded the EPA Benchmark value for TSS. For

9   example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates

10  exceedance levels of TSS at 2,420 mg/L, which is more than twenty-four (24) times the

11  EPA Benchmark value for TSS of 100 mg/L. *Id.*

12  213.   Plaintiffs are informed, believe, and thereon allege that storm water

13  discharged from the PTS Facility has exceeded the EPA Benchmark value for iron. For

14  example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates

15  exceedance levels of iron at 46.4 mg/L, which is more than forty-six (46) times the EPA

16  Benchmark value for total iron of 1.0 mg/L. *Id.*

17  214.   Plaintiffs are informed, believe, and thereon allege that storm water

18  discharged from the PTS Facility has exceeded the EPA Benchmark value for aluminum.

19  For example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates

20  exceedance levels of aluminum at 42.9 mg/L, which is more than fifty-seven (57) times

21  the EPA Benchmark value for total aluminum of 0.75 mg/L at a pH between 6.5-9.0. *Id.*

22  215.   Plaintiffs are informed, believe, and thereon allege that storm water

23  discharged from the PTS Facility has exceeded the EPA Benchmark value for lead. For

24  example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates

25  exceedance levels of lead at 0.145 mg/L, which exceeds the EPA Benchmark value for

26  total lead of 0.082 mg/L for freshwater based on 100mg/L hardness. *Id.*

27  216.   Plaintiffs are informed, believe, and thereon allege that storm water

28  discharged from the PTS Facility has exceeded the EPA Benchmark value for copper. For

example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates exceedance levels of copper at 0.405 mg/L, which is more than twenty-eight (28) times the EPA Benchmark value for total copper of 0.013 mg/L for freshwater based on 100mg/L hardness. *Id*.

217.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the PTS Facility has exceeded the EPA Benchmark value for zinc. For example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates exceedance levels of zinc at 1.77 mg/L, which is more than fourteen (14) times the EPA Benchmark value for total zinc of 0.12 mg/L for freshwater based on 100mg/L hardness. *Id*.

218.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the PTS Facility has exceeded the EPA Benchmark value for chemical oxygen demand. For example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates exceedance levels of chemical oxygen demand at 1,820 mg/L, which is more than fifteen (15) times the EPA Benchmark value for total chemical oxygen demand of 120 mg/L. *Id*.

219.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the PTS Facility has exceeded the EPA Benchmark value for electrical conductivity. For example, Defendants' monitoring data from December 2, 2014 indicates exceedance levels of electrical conductivity at 1,520 umhos/cm, which is more than three (3) times the EPA Benchmark value for total electrical conductivity of 200 umhos/cm. *Id*.

220.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the PTS Facility has exceeded the EPA Benchmark value for oil and grease. For example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates exceedance levels of oil and grease at 15.9mg/L, which exceeds the EPA Benchmark value for total oil and grease of 15 mg/L. *Id*.

221.   As EPA Benchmarks are relevant and objective standards for evaluating

whether a permittee's BMPs achieve compliance with BAT/BCT standards, Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, that the PTS Facility has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the Facility. *See* 1997 Permit § B.3; 2015 Permit § V.A.

222.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility's repeated exceedances of EPA Benchmarks over the past five years for pollutants, including N+N, phosphorus, TSS, lead, iron, aluminum, copper, zinc, chemical oxygen demand, electrical conductivity, and oil and grease indicate that the Facility has failed and continues to fail to develop and/or implement BMPs that meet BAT/BCT.

## 2. Discharges of Polluted Storm Water from the PTS Facility Violate General Industrial Permit Receiving Water Limitations

223.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility has violated and continues to violate multiple General Industrial Permit Receiving Water Limitations.

224.   Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the PTS Facility has exceeded the CTR Water Quality Standards applicable to lead in California. For example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates levels of lead as high as 0.145 mg/L, which is over twice the freshwater CTR limit of 0.065 mg/L based on 100mg/L hardness. 40 C.F.R. § 131.38.

225.   Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the PTS Facility has exceeded the CTR Water Quality Standards applicable to copper in California. For example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates levels of copper as high as 0.405 mg/L, which is over thirty-one (31) times the freshwater CTR limit of 0.013 mg/L based on 100mg/L hardness. *Id*.

226.   Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the PTS Facility has exceeded the CTR Water Quality Standards

applicable to zinc in California. For example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates levels of zinc as high as 1.77 mg/L, which is over fourteen (14) times the freshwater CTR limit of 0.12 mg/L based on 100mg/L hardness. *Id.*

227.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the PTS Facility has exceeded the Basin Plan water quality objective for enterococcus. For example, Defendants' monitoring data from January 31, 2019 for SW-1, SW-2, and SW-3 reflects levels of enterococcus exceeding 1,600 MPN/100 ml, which is over twenty-six (26) times the Basin Plan objective for enterococcus of 61 MPN/100 ml in waters with a designated Beneficial Use of contact recreation such as Agua Hedionda Creek. *See* Basin Plan at 3-7.

228.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the PTS Facility has exceeded the Basin Plan water quality objective for fecal coliform. For example, Defendants' monitoring data from January 31, 2019 for SW-1, SW-2, and SW-3 reflects levels of enterococcus exceeding 1,600 MPN/100 ml, which is four (4) times the Basin Plan objective for fecal coliform of 400 MPN/100 ml in waters with a designated Beneficial Use of contact recreation such as Agua Hedionda Creek. *Id.*

229.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the PTS Facility has exceeded the Basin Plan water quality objective for iron. For example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates levels of iron as high as 46.4 mg/L, which is over one hundred fifty-four (154) times the Basin Plan objective of 0.3 mg/L for iron specifically in the Agua Hedionda Hydrological Area. *See* Basin Plan, Table 3-2.

230.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the PTS Facility has exceeded the Basin Plan water quality objective for manganese. For example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates levels of iron as high as 0.885 mg/L, which is over one seventeen (17) times the Basin Plan objective of 0.05 mg/L for manganese specifically in the Agua Hedionda Hydrological Area. *Id.*

231.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the PTS Facility has exceeded the Basin Plan water quality objective for phosphorus. For example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates levels of phosphorus as high as 5.2 mg/L, which is fifty-two (52) times the Basin Plan objective of 0.1 mg/L for phosphorus specifically in the Agua Hedionda Hydrological Area. *Id*.

232.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the PTS Facility has exceeded the Basin Plan water quality objective for TSS. For example, Defendants' monitoring data from January 31, 2019 for SW-2 indicates exceedance levels of TSS at 2,420 mg/L. The Basin Plan mandates that "Waters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Basin Plan, 3-32.

233.   The Receiving Waters downstream from the PTS Facility are impaired, and thus unable to support their designated Beneficial Uses.

234.   Agua Hedionda Creek is impaired for phosphorus and nitrogen, both nutrients, which when present at high concentrations can result in eutrophic conditions or excessive algal blooms in a water body. Such conditions depress the dissolved oxygen content of water and can result in mass fish die-offs, human health issues, and problems with taste, odors, color, and increased turbidity. Basin Plan at 3-8.

235.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility's storm water discharges contain elevated concentrations of phosphorus and N+N, in exceedance of receiving water limitations, which cause or contribute to the phosphorus and nitrogen impairments of Agua Hedionda Creek.

236.   Agua Hedionda Creek is impaired for indicator bacteria, specifically, enterococcus and fecal coliform. The presence of these bacteria in a water body indicates the presence or absence of pathogens such as viruses, bacteria, and protozoans that can cause disease. Human illness can result from drinking or swimming in water that contains elevated levels of pathogens or from eating shellfish harvested from such waters. *See*

Basin Plan at 3-6.

237.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility's storm water discharges contain elevated concentrations of enterococcus and fecal coliform, in exceedance of receiving water limitations, which cause or contribute to the indicator bacteria impairment of Agua Hedionda Creek.

238.   Agua Hedionda Creek is impaired for manganese. "Manganese is undesirable in domestic water supplies because it causes unpleasant tastes, deposits on food during cooking, stains and discolors laundry and plumbing fixtures, and fosters the growth of some microorganisms in reservoirs, filters, and distribution systems." Basin Plan at 3-27.

239.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility's storm water discharges contain elevated concentrations of manganese, in exceedance of receiving water limitations, which cause or contribute to the manganese impairment of Agua Hedionda Creek.

240.   Agua Hedionda Creek and Agua Hedionda Lagoon are impaired for toxicity. The Basin Plan states that all waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life. Basin Plan at 3-26.

241.   Lead, zinc, and copper are considered toxic pollutants, and these limitations on these pollutants are specifically enumerated in the California Toxics Rules. 40 C.F.R. § 131.38. Moreover, Plaintiffs allege that discharges of elevated concentrations of lead, zinc, and copper cause and/or contribute to the toxicity and toxicity of Receiving Waters.

242.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility's storm water discharges contain elevated concentrations of lead, copper, and zinc, in exceedance of receiving water limitations, which cause or contribute to the toxicity impairments of Agua Hedionda Creek and Agua Hedionda Lagoon.

243.   Because the CTR and Basin Plan are applicable WQSs under the General Industrial Permit, Plaintiffs are informed, believe, and thereon allege that discharges from

the PTS Facility contain concentrations of pollutants that cause or contribute to violations of multiple applicable WQSs, and thus violate Receiving Water Limitation C.2 of the 1997 Permit and/or Receiving Water Limitation VI.A of the 2015 Permit.

244.   Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants in the storm water from the PTS Facility also adversely impacts human health, thus violating the Permit Receiving Water Limitation C.1 of the1997 Permit, and VI.B of the 2015 Permit.

245.   Each time the PTS Owners and/or Operators discharge polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time the Facility discharges polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

246.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility has been in violation of these Effluent Limitations since May 22, 2014, and Plaintiffs will update the dates of violations when additional information and data become available. The PTS Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since May 22, 2014.

247.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility's discharge violations are ongoing and will continue each time contaminated storm water is discharged in violation of the General Industrial Permit Receiving Water Limitations.

248.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility has been in violation of the Permit's Receiving Water Limitations since May 22, 2014, and Plaintiffs will update the dates of violation when additional information and data becomes available. The PTS Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since May 22, 2014.

/././

E.     **The PTS Facility Owners and/or Operators Violate General Industrial Permit SWPPP Requirements**

249.   As discussed *supra*, Palomar has uploaded two versions of the Facility SWPPP to the SMARTS database – the Palomar 2015 SWPPP and the Palomar 2016 SWPPP.

250.   Plaintiffs are informed, believe, and thereon allege that Palomar has not revised the PTS Facility SWPPP at any other time for any other reason.

251.   Plaintiffs are informed, believe, and thereon allege that the Palomar 2016 SWPPP is the current SWPPP that covers Palomar's operations at the PTS Facility.

252.   As discussed *supra*, CWM has uploaded two versions of the Facility SWPPP to the SMARTS database – the CWM 2015 SWPPP and the CWM 2016 SWPPP.

253.   Plaintiffs are informed, believe, and thereon allege that CWM has not revised the PTS Facility SWPPP at any other time for any other reason.

254.   Plaintiffs are informed, believe, and thereon allege that the CWM 2016 SWPPP is the current SWPPP that covers CWM's operations at the PTS Facility.

255.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators have conducted and continue to conduct operations at the Facility with inadequately developed and/or implemented SWPPPs.

256.   Plaintiffs are informed, believe, and thereon allege that the PTS site maps have failed and continue to fail to identify all storm water discharge locations as required by the General Industrial Permit.

257.   Plaintiffs are informed, believe, and thereon allege that the PTS site maps have failed and continue to fail to identify all areas of industrial activity as required by the General Industrial Permit.

258.   Plaintiffs are informed, believe, and thereon allege that the PTS site maps have failed and continue to fail to identify all associated pollutant sources as required by the General Industrial Permit.

259.   Plaintiffs are informed, believe, and thereon allege that the PTS site maps

have failed and continue to fail to identify all BMPs as required by the General Industrial Permit.

260.   Plaintiffs are informed, believe, and thereon allege that the PTS SWPPPs and site maps have failed and continue to fail to adequately describe the locations where all materials are stored, received, shipped, and handled, and/or the typical quantities and frequency of significant materials at the Facility.

261.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators have failed and continue to fail to accurately identify all areas of industrial activity in the Facility SWPPPs.

262.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators have failed and continue to fail to adequately describe all industrial activities in the Facility SWPPPs.

263.   Plaintiffs are informed, believe, and thereon allege that because the PTS Facility Owners and/or Operators have failed and continue to fail to adequately describe all industrial activities, the Facility SWPPPs have failed and continue to fail to adequately describe all significant materials and processes that are related to the industrial activities at the Facility.

264.   Plaintiffs are informed, believe, and thereon allege that the PTS SWPPPs have failed and continue to fail to adequately and/or accurately assess pollutants associated with potential pollutant sources at the Facility. For example, Pollutant Source Assessment Table 2.1.a of the Palomar 2016 SWPPP indicates that E.coli and enterococcus (measured as indicator bacteria, enterococcus, fecal coliform, and total coliform) are "[p]resent at Facility as part of Industrial Activity," and "[p]ossibly in trash," yet paradoxically states that there is no potential to discharge such pathogens.

265.   Information available to Coastkeeper and CERF indicates that similarly situated waste transfer and recycling facilities have a potential to discharge such pathogens, and that absent BMPs tailored to address them, such facilities often discharge pathogens in quantities that exceed EPA Benchmarks and applicable WQS.

266.   Plaintiffs are informed, believe, and thereon allege that Facility Owners and/or Operators failed to submit any storm water sampling results for these indicator bacteria pathogens until January 31, 2019, over ten months after receiving Plaintiff's Notice Letter, even though Agua Hedionda Creek is impaired for enterococcus and fecal coliform in violation of the General Industrial Permit SWPPP requirements. Unsurprisingly, when the PTS Owners and/or Operators finally analyzed the Facility's storm water samples for indicator bacteria, every sample result showed levels of enterococcus and fecal coliform far in exceedance of applicable WQSs.

267.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility SWPPPs have failed and continue to fail to require that the Facility storm water samples are analyzed for enterococcus and fecal coliform in violation of the General Industrial Permit.

268.   The Palomar 2016 SWPPP also indicates that copper is present at the facility and that its source is "Recycled materials storage," yet the Facility Owners and/or Operators failed to submitted any storm water sampling results for copper until January 31, 2019, over ten months after receiving Plaintiff's Notice Letter. *See* Palomar 2016 SWPPP, Table 2.1.a. Unsurprisingly, when the PTS Owners and/or Operators finally analyzed the Facility's storm water samples for copper, every sample result showed levels of copper far in exceedance of applicable WQSs.

269.    Plaintiffs are informed, believe, and thereon allege that the PTS Facility SWPPPs have failed and continue to fail to require that the Facility storm water samples are analyzed for copper in violation of the General Industrial Permit.

270.   Plaintiffs are informed, believe, and thereon allege that Table 2.1.a of the Palomar 2016 SWPPP denies the presence of numerous other industrial pollutants that are often found in storm water discharging from similarly situated waste transfer and recycling facilities, including ammonia as nitrogen, dissolved oxygen, manganese, selenium, nitrogen, phosphorus, turbidity, and total dissolved solids.

271.   Plaintiffs are informed, believe, and thereon allege that Table 2.1.a of the

Palomar 2016 SWPPP fails to even mention other potential pollutants that are commonly present in storm water discharged from similarly situated facilities, including chemical oxygen demand (originating in liquid residues from recyclable materials), and metals such as aluminum, lead, zinc, and iron (originating in recyclable materials, construction and demolition, solid waste, metal roofs, and equipment, bins, and trucks).

272.   Plaintiffs are informed, believe, and thereon allege that the Palomar 2016 SWPPP's failure to mention or consider iron is particularly egregious considering that the Facility previously measured iron exceedances of twelve (12) times and twenty-six times (26) EPA Benchmarks in the 2013-14 and 2014-15 reporting periods, respectively. Iron exceedances in the 2013-14 reporting periods measured forty (40) times the WQS for iron of .3mg/L, and iron exceedances in the 2014-15 reporting periods measured eighty-eight (88) times the WQS for iron. Subsequent to these measured exceedances, the Facility Owners and/or Operators discontinued testing for iron and failed to address iron in subsequent SWPPPs. Unsurprisingly, when the PTS Owners and/or Operators finally analyzed the Facility's storm water samples for iron on January 31, 2019, every sample result showed levels of iron far in exceedance of applicable WQSs, the highest of which was 154 times the Basin Plan objective of .3mg/L.

273.   As the General Industrial Permit requires Facility Owners and/or Operators to analyze storm water dischargers for all pollutants that are likely to be present in the facility's discharges in significant quantities, Plaintiffs are informed, believe, and thereon allege that the PTS SWPPPs have failed and continue to fail to require the analysis of storm water discharges from the Facility for all parameters required by the Permit. *See* 2015 Permit, § B.5.c.

274.   Plaintiffs are informed, believe, and thereon allege that, due in part to the PTS Facilities SWPPPs' failure to adequately assess all pollutants and pollutant sources at the Facility, storm water discharged from the PTS Facility contained pollutant levels for enterococcus, fecal coliform, lead, copper, zinc, aluminum, iron, manganese, N+N, phosphorus, chemical oxygen demand, TSS, oil and grease, and pH, in exceedance of

EPA Benchmarks values, CTR limits, and/or Basin Plan objectives in violation of the General Industrial Permit.

275.   Plaintiffs are informed, believe, and thereon allege that PTS Facility Owners and/or Operators have also failed to revise the Facility's SWPPP to ensure compliance with the General Industrial Permit.

276.   Plaintiffs are informed, believe, and thereon allege that, despite the significant concentrations of pollutants in the Facility's storm water discharges each year, information available to Plaintiffs indicates that the Facility SWPPPs have not significantly changed throughout the Facility Owners and/or Operators' industrial operations at the Facility, and have not been revised to include additional BMPs to adequately eliminate or reduce these pollutants, as required by the General Industrial Permit. For example, Table 2.1.a of the 2015 Palomar SWPPP lists gross pollutants, trace metals, oil and grease, hydrocarbons, trash, debris, and TSS as pollutants associated with industrial activities in DA2, potentially exposed to storm water through tracking, leaks, spills, debris from vehicles, maintenance activities, and debris from container maintenance. Though the 2015 Palomar SWPPP addresses structural BMPs for the northern and eastern portions of DA2, the entire main bin and container storage area in DA2 south of the main building drains directly towards SW-2 and discharges off site without passing through any advanced structural BMPs that might filter or settle out pollutants in storm water that comes into contact with the bins and containers stored there and the vehicles passing through.

277.   Plaintiffs are informed, believe, and thereon allege that the 2016 Palomar SWPPP also failed to include any advanced structural BMP near SW-2 that would address this portion of DA2. Facility Owners and/or Operators have been aware that this area of DA2 is a potential source of pollutants, as acknowledged in section 3.1.3.1 of the December 2017 Level 2 Action Plan that "waste bin storage and maintenance activities may also be a source of TSS," but the SWPPP has not been adequately revised to address this area.

278.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility's SWPPPs have not substantively changed even after the Facility entered Level 1 status for discharging storm water with levels of pollutants that exceed the 2015 Permit's NALs as described *infra* in Section IV.H.

279.   The 2015 Permit requires revisions to SWPPPs to identify what BMPs will be improved, and/or if additional BMPs must be developed and implemented to prevent further exceedances of the NALs, or otherwise comply with the General Industrial Permit. *See* 2015 Permit, § XII(C). However, the Palomar 2015 SWPPP (developed prior to the Facility entering Level 1 status) is essentially identical to the Palomar 2016 SWPPP, which was submitted as a "revised" SWPPP after the Facility entered Level 1 status.

280.   For example, Section 5.5.4 of the Palomar 2015 SWPPP indicates that, "If identified deficiencies require design changes, including additional BMPs, the implementation of changes will be completed as soon as possible, and the SWPPP will be amended to reflect the changes." Despite the repeated, continuous, and numerous ongoing discharge of storm water containing pollutant levels that exceed EPA Benchmarks and applicable WQS, not to mention NAL exceedances, the Palomar 2016 SWPPP merely repeats the same 5.5.4 language, and fails to include any analysis into the deficiencies in existing BMPs that caused the NAL exceedance or plans to specifically address those deficiencies. *See* Palomar 2015 SWPPP, § 5.5.4; *see also* Palomar 2016 SWPPP, § 5.5.4.

281.   Further, Section 6.3 of the CWM 2016 SWPPP states that "site management is currently exploring the option of installing a structural treatment control BMP at SW-2 to further reduce sediment at this discharge point," but fails to go into any specifics or commit to a firm timeline. *See* CWM 2016 SWPPP, § 6.3; *see also* Ex. A, (Table of Facility stormwater sampling data compared to EPA Benchmarks and WQSs).

282.   Plaintiffs are informed, believe, and thereon allege that without properly identifying all industrial activities in the PTS Facility SWPPPs, the PTS Owners and/or

Operators cannot and have not developed and/or implemented all appropriate BMPs at each facility.

283.   Plaintiffs are informed, believe, and thereon allege that without properly identifying all significant materials in the PTS Facility SWPPPs, the PTS Owners and/or Operators cannot and have not developed and/or implemented all appropriate BMPs at each facility.

284.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility SWPPPs fail to assess the BMPs with respect to the Facility's potential pollutant sources.

285.   As discussed *supra*, exceedances of the General Industrial Permit Effluent Limitations, such as EPA benchmarks, and applicable Receiving Water Limitations, such as the CTR and Basin Plan, are indicators that a facility has failed to develop and implement BMPs that meet BAT/BCT.

286.   As discussed *supra*, Defendants' own sampling data demonstrates that each of the PTS Facility discharged storm water with concentrations of enterococcus, fecal coliform, lead, copper, zinc, aluminum, iron, manganese, N+N, phosphorus, chemical oxygen demand, TSS, oil and grease, and pH, in exceedance of EPA Benchmarks values, CTR limits, and/or Basin Plan objectives.

287.   Because the PTS Facility has discharged numerous pollutants in exceedance of Effluent Limitations and Receiving Water Limitations, Plaintiffs are informed, believe, and thereon allege that the PTS Owners and/or Operators have failed to develop and/or implement BMPs that:

      i.   adequately minimize the exposure of pollutants to storm water at the Facilities;

     ii.   adequately control and minimize polluted runoff from the Facilities;

    iii.   adequately treat and remove pollutants in storm water prior to the discharge;

    iv.   adequately prevent or control contaminated storm water from being discharged from the Facilities; and

v. adequately prevent or control contaminated NSWDs from being discharged from the Facilities.

288. Plaintiffs are informed, believe, and thereon allege that that the PTS Facility Owners and/or Operators have failed and continue to fail to develop and/or implement SWPPPs for the Facility that contain BMPs that achieve BAT/BCT in violation of the General Industrial Permit.

289. Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators have also failed to properly operate and maintain the structures and systems put in place at the Facility to achieve compliance with the General Industrial Permit and its SWPPP requirements.

290. Plaintiffs are informed, believe, and thereon allege that PTS Facility SWPPPs fail to analyze the effectiveness of each Facility's existing BMPs.

291. Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators have failed to evaluate and revise the Facility SWPPPs to ensure compliance with the General Industrial Permit, as required by Sections A.9-10 of the 1997 Permit, and Sections X.A.9 and X.B.1 of the 2015 Permit.

292. Plaintiffs are informed, believe, and thereon allege that the inadequacy of the BMPs at the PTS Facility is in part a result of the PTS Owners and/or Operators' failure to develop, implement, and revise adequate SWPPPs.

293. Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators' failure to revise the Facility's SWPPPs, and thus failure to improve the Facility's BMPs, despite the numerous and repeated exceedances of Effluent Limitations, Receiving Water Limitations, and NALs identified in Defendant's own monitoring data, ensures that these exceedances will continue in violation of the General Industrial Permit.

294. Every day the PTS Facility Owners and/or Operators operate the Facility with an inadequately developed and/or implemented SWPPP, and/or without properly revising each SWPPP, is a separate and distinct violation of the General Industrial

Permit, New Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

295.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit SWPPP requirements since at least May 22, 2014. These violations are ongoing, and Plaintiffs will include additional violations when information becomes available.

**F.     Defendants Have Failed to Develop, Implement, and/or Revise Adequate Monitoring and Reporting Programs at the PTS Facility**

296.   Plaintiffs are informed, believe, and thereon allege, that the PTS Facility Owners and/or Operators have been and continue to conduct operations at the Facility with an inadequately developed, implemented, and/or revised M&RP.

297.   Plaintiffs are informed, believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to develop and/or implement an M&RP that requires storm water samples be collected from all discharge locations at the Facility in violation of the General Industrial Permit.

298.   Based on the Facility SWPPPs, Annual Reports, and Coastkeeper and CERF's observations, Plaintiffs are informed, believe, and thereon allege, that the Facility Owners and/or Operators have never collected storm water samples from all discharge locations at the Facility.

299.   Although Section B.7.d of the 1997 Permit and Section XI.C.4 of the 2015 Permit allow permittees to reduce the number of locations to be sampled, Plaintiffs are informed, believe, and thereon allege, that there is no indication that the Facility Owners and/or Operators have complied with the requirements of Section B.7.d of the 1997 Permit or Section XI.C.4 of the 2015 Permit to justify sampling a reduced number of discharge locations at the Facility. For example, CWM has acknowledged that "A small portion of public access road sheet flows west [from DA1] and discharges off-site via sheet flow." *See* 2016 CWM SWPPP, § 3.3. This discharge point is unsampled and lacks

1  any BMPs to prevent run-on/run-off or track-in/track-out from the industrial areas in

2  DA1.

3      300.   Further, information available to Coastkeeper and CERF indicates that the

4  southernmost driveway (from DA3) is another unsampled discharge location at the

5  Facility. On January 17, 2018, the City of Carlsbad reported "Liquid in street exiting WM

6  Transfer Station" via this driveway, and storm water inspector Jacob Feil determined that

7  the Facility failed an inspection because of "[a]ccidental discharge of hydraulic fluid to

8  street." City photos of the incident show fluid covering Orion Road as well as the

9  southernmost driveway from the Facility, which is unsampled and which serves as a point

10 of egress for vehicles that regularly pass and track pollutants through DA2 and DA3 as

11 they exit the site.

12     301.   Plaintiffs are informed, believe, and thereon allege, that the PTS Facility

13 Owners and/or Operators fail to conduct the required storm water analysis. For example,

14 as a waste and metal recycling, storage, and transfer facility, the PTS Facility Owners

15 and/or Operators are required to analyze samples for, at a minimum, the following

16 pollutants in addition to the parameters currently analyzed: iron, copper, aluminum and

17 zinc, SC, and bacteria. However, the PTS Facility Owners and/or Operators have

18 consistently failed to sample for these parameters during every reporting period for the

19 past five years.

20     302.   The PTS Facility Owners and/or Operators analyzed samples for iron and

21 SC in the 2013-14 Wet Season and 2014-15 Wet Season, and the corresponding lab

22 reports documented elevated levels of both parameters in the Facility's discharges. *See*

23 Ex. A. However, during the 2015-16, 2016-17, and 2017-18 reporting periods, Facility

24 Owners and/or Operators failed to analyze Facility storm water samples for iron, SC, and

25 numerous other pollutants that are likely to be present in the facility's discharges in

26 significant quantities. Thus, the Facility Owners and/or Operators were aware that these

27 pollutants were not only present at the Facility, but that the Facility was discharging

28 elevated levels these pollutants, and yet failed to continue sampling for them in violation

of the Permit's M&RP requirements.

303.   Facility Owners and/or Operators identified copper and bacteria as pollutants present at the Facility as part of industrial operations, but never tested for those pollutants until January 31, 2019, in violation of the Permit's M&RP requirements. The January 31, 2019 sampling results showed that the Facility discharged copper in concentrations higher than thirty-one (31) times the Basin Plan objective, and enterococcus in concentrations higher than twenty-six (26) times the Basin Plan objective.

304.   In addition, as indicated in the Palomar 2016 SWPPP, bacteria is associated with operations at the Facility including waste collection and storage, and pollutant sources such as the waste and recycling bins. The Palomar 2016 SWPPP identifies that this pollutant is "Present at Facility as part of Industrial Activity", and "possibly in trash." *See* Palomar 2016 SWPPP, Table 2.1.a. However, the M&RP section of the Palomar 2016 SWPPP fails to acknowledge the impairment of the Receiving Waters for this pollutant, and also erroneously states that there is no potential to discharge bacteria from the Facility. *Id.* Neither Palomar nor CWM ever submitted bacterial sampling results to SMARTs until January 31, 2019.

305.   Plaintiffs are informed, believe, and thereon allege, that the PTS Facility Owners and/or Operators used improper monitoring and sampling techniques in analyzing Facility storm water samples for pH. For example, the sample results for pH that the PTS Facility Owners and/or Operators submitted to SMARTs for the 2016-17 reporting period are highly suspect, as they show zero variability between sample locations (SW-1, SW-2, and SW-3) and are whole numbers. Palomar consistently submitted the exact same value (6.00) twelve (12) times in a row, while CWM submitted 6.00 eleven (11) times and 5.0 once. For comparison, CWM's pH readings prior to the 2016-17 reporting periods measured 7.25, 6.69, 6.94, and Palomar's pH readings prior to the 2016-17 reporting period had measured 7.1, 8.1, 7.9, 8.4, 8.41, 7.99, and 8.76. As such, the 2016-17 results are indicative of improper monitoring and sampling technique.

306.   Plaintiffs are informed, believe, and thereon allege, that the PTS Facility

Owners and/or Operators failed to report all storm water sample results to the Regional Board. Specifically, on more than one occasion, the Facility Owners and/or Operators analyzed storm water samples collected at the Facility for pollutants associated with its industrial activity, but either redacted the results before submitting them to the SMARTS database or failed to submit them to SMARTS in violation of the General Industrial Permit requirement to submit all sample data to the regulatory agency. *See* 2015 Permit, § XI(B)(11). For example, on December 11, 2015, December 22, 2015, and January 5, 2016, the Facility Owners and/or Operators analyzed the Facility's storm water discharges for TSS, returning readings which averaged 700 mg/L, seven (7) times the EPA Benchmark, but failed to submit this data to SMARTS. *See* Palomar Exceedance Response Action Level 1 Evaluation and Report, § 3.

307.   Plaintiffs are informed, believe, and thereon allege, that the PTS Facility Owners and/or Operators failed to collect samples for the requisite number of QSEs. For example, the Facility Owners and/or Operators failed to collect any samples from July 1 to December 31, 2017 in violation of the M&RP, which requires that two samples be taken during this time period. *See* 2015 Permit, § XI.B.2. There were numerous qualifying storm events during this period. *See* Ex. A, (table of precipitation data).

308.   Plaintiffs are informed, believe, and thereon allege, that the PTS Facility Owners and/or Operators failed to conduct visual observations and monitoring as required by the Permit's M&RP requirements. Based on information available to Coastkeeper and CERF, including Annual Reports and City inspection reports, the Facility Owners and/or Operators fail to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

309.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility M&RP has failed and/or continues to fail to ensure that BMPs have been adequately developed and/or implemented, or revised if necessary. *See* 1997 Permit, §§ B.2.a-b; 2015 Permit §§ X.I, XI.

310.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility

M&RP has failed and/or continues to fail to ensure that storm water and non-storm water discharges are in compliance with the General Industrial Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations in violation of the General Industrial Permit. *See* 1997 Permit § B.2; 2015 Permit §§ I.J.55-56, XI.

311.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators have failed to revise each M&RP as necessary to ensure compliance with the General Industrial Permit. *See* 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

312.   Because the PTS Owners and/or Operators have failed to revise each M&RP as required by the General Industrial Permit, each PTS M&RP fails to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility in violation of the Permit. *See* 1997 Permit § B.4.c; 2015 Permit § X.B.1.

## G.   Defendants Have Failed to Comply with the General Industrial Permit's Reporting Requirements

313.   Plaintiffs are informed, believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to submit Annual Reports that comply with General Industrial Permit reporting requirements.

314.   In each Annual Report since the filing of the 2013-14 Annual Reports, the Facility Owners and/or Operators certify that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the General Industrial Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the General Industrial Permit, or will otherwise be revised to achieve compliance. However, information available to Coastkeeper and CERF indicates that these certifications are erroneous. For example, storm water samples collected from the Facility contain concentrations of pollutants above EPA Benchmarks and WQSs, thus demonstrating that the Facility BMPs do not adequately address existing potential pollutant sources. Further, as discussed herein, the Facility's SWPPPs do not include many elements required by the General Industrial Permit, and thus it is erroneous to

certify that the SWPPPs comply with the General Industrial Permit.

315.   Moreover, in each Palomar and CWM Annual Report since the 2015-16 reporting period, the Facility Owners and/or Operators erroneously signed and certified that each and every pollutant identified within the impaired watershed was not present at the PTS Facility. These pollutants include, but are not limited to dissolved oxygen, enterococcus, fecal coliform, copper, manganese, nitrate, nitrite, and phosphorus. When Defendants finally sampled for these parameters for the first time on January 31, 2019, Defendant's own monitoring data reflected that all of these pollutants were present in the Facility's storm water discharges in exceedance of Effluent Limitations and Receiving Water Limitations. Therefore, the Facility Owners and/or Operators' annual certifications that these pollutants were not present at the facility were erroneous, and egregiously inaccurate.

316.   Facility operators must report any noncompliance with the General Industrial Permit at the time that the Annual Report is submitted, including 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit, § C.11.d; 2015 Permit, § XVI.B.2.

317.   Plaintiffs are informed, believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed to report numerous instances of non-compliance as required by the General Industrial Permit. For example, in both CWM's and Palomar's 2015-16 Annual Reports, Facility Owners and/or Operators did not submit samples for the required number of QSEs during the reporting year for all discharge locations, yet the PTS Owners and/or Operators failed to comply with all non-compliance reporting requirements enumerated in Section XVI.B.2 of the 2015 Permit.

318.   Further, the PTS Facility Owners and/or Operators have failed to report all storm water sample results. Specifically, storm water sampling data submitted to SMARTS failed to include data that Palomar later cited in its September 2016

Exceedance Response Action Level 1 Evaluation and Report, specifically, December 2015 and January 2016 TSS readings averaging 700 mg/L, or seven (7) times the EPA Benchmark. Again, Palomar failed to comply with all requirements enumerated in Section XVI.B.2 of the 2015 Permit.

319.   Plaintiffs are informed, believe, and thereon allege that the PTS Owners and/or Operators failed to conduct adequate monthly visual observations of stormwater discharges, stormwater drainage areas, and for the presence of unauthorized non-storm water discharges at the Facility from May 22, 2014 to the present. *See* 1997 Permit § B.4.a (monthly observations of each discharge location required); 2015 Permit § XI.A.1 (monthly observations of each drainage area required).

320.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators failed to conduct annual inspections of all drainage areas previously identified as having no exposure to industrial activities and materials for the Facility throughout each reporting period since May 22, 2014. *See* 2015 Permit § XV.C.

321.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators failed to conduct annual inspections of all BMPs, equipment needed to implement BMPs, and an assessment of the effectiveness of all BMPs for the Facility throughout each reporting period since May 22, 2014. *See* 1997 Permit § A.9.c; 2015 Permit §§ XV.D-F.

322.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators failed to indicate the presence of all potential pollutants at the Facility for each reporting period since May 22, 2014.

323.   Each day that Defendants have operated and continue to operate the PTS Facility without meeting each reporting requirement of the General Industrial Permit constitutes a separate violation of the Permit and the CWA.

**H.   The PTS Facilities Owners and/or Operators Have Failed and Continue to Fail to Comply with Level 1 and Level 2 ERA Requirements**

324.   In September 2016, Facility Owners and/or Operators submitted an ERA

Level 1 report ("2016 Level 1 ERA Report") which is publicly available via the SMARTS database.

325.   The 2016 Level 1 ERA Report shows that the PTS Facility entered Level 1 status for TSS based on NAL exceedances during the 2015-16 reporting period. The annual average of storm water samples collected at the Facility for TSS during the 2015-16 reporting year was 847 mg/L—more than 8 (eight) times over the annual NAL for TSS of 100 mg/L.

326.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators failed to conduct an adequate Level 1 status evaluation to identify additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances at the Facility. For example, the evaluation supposedly included a review of the SWPPP, the M&RP, BMPs and the Facility site map and recommended several enhanced BMPs. However, despite the PTS Facility's storm water discharges of TSS averaging concentrations over eight times higher than the that annual NAL standard, based on the Level 1 status evaluation, the 2016 Level 1 ERA Report "did not identify deficiencies with the site SWPPPs." 2016 TSS Level 1 ERA Report at 3.

327.   The 2016 Level 1 ERA Report further states that "additional investigation and/or monitoring will not be necessary to identify the potential pollutants source." *Id* at 4.

328.   Plaintiffs are informed, believe, and thereon allege that the failure of the 2016 Level 1 ERA Report's status evaluation to identify a single deficiency with the PTS Facility's SWPPP, despite extreme exceedance of the TSS NAL standard, violates the ERA requirements of the 2015 Permit.

329.   Plaintiffs are informed, believe, and thereon allege that the PTS Facility Owners and/or Operators have also failed and continue to fail to adequately revise the Facility SWPPPs to include additional BMPs necessary to prevent future NAL exceedances, as required by the General Industrial Permit. *See* 2015 Permit, § XII.

330.   Plaintiffs are informed, believe, and thereon allege that the 2016 Level 1

ERA Report fails to adequately discuss BMPs to address the Facility's NAL TSS exceedances. For example, rather than conducting an evaluation to identify the BMPs implemented at the Facility that correspond to the NAL exceedances for TSS, the 2016 Level 1 ERA Report notes that probable sources of TSS at the Facility include "vehicle traffic, truck traffic, non-paved parking area, industrial activity, truck movement around the site, [and] background from slopes." 2016 Level 1 ERA Report at 4. The Report fails to consider the impact of storm water coming into contact with vehicles and containers in the bin storage area in the southern portion of DA2, and fails to make any recommendation for an advanced BMP at that location, despite TSS readings at SW-2 being much higher than those from any other sample location.

331.   Plaintiffs are informed, believe, and thereon allege, that the 2016 Level 1 ERA Report lacks the required detail and site-specific evaluation and analysis required by the 2015 Permit in violation of Section XII.C.

332.   Plaintiffs are informed, believe, and thereon allege, that as a result of the PTS Facility Owners and/or Operators failure to conduct an adequate Level 1 status evaluation or submit a Level 1 ERA Report that complies with the General Industrial Permit, the Facility entered Level 2 status on July 1, 2017.

333.   In December 2017, the PTS Facility Owners and/or Operators submitted an ERA Level 2 Report ("2017 Level 2 ERA Report") which is publicly available via the SMARTS database.

334.   The 2017 Level 2 ERA Report shows that the annual average for TSS during the 2016-17 Reporting Year was 226, over twice the annual NAL for TSS of 100 mg/L.

335.   Plaintiffs are informed, believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to adequately describe and evaluate the Facility's industrial pollutant sources in the Level 1 and Level 2 ERA Reports.

336.   Because Plaintiffs are informed, believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed to adequately describe and evaluate the

Facility's pollutant sources, the Level 1 and Level 2 ERA Reports failed to describe, implement, develop and/or implement BMPs that would reduce or prevent NAL exceedances. For example, the 2017 Level 2 ERA Report recommended implementing a "BioClean Kraken system [which] is currently in design," "tentatively scheduled to be completed and ready to evaluate for effectiveness by the 2018 to 2019 MY." "All flows from SW-1, SW-2, and SW-3 will be routed to the Kraken unit and be treated before discharging from the site." Appendix C, which details the Kraken's technical specifications, claims that it will remove 89% of TSS. However, the PTS Facility's discharges of TSS during the 2018-19 reporting period, which have thus far been reported to the SMARTS database, indicate an average 507 mg/L, which exceeds the NAL for TSS by over five (5) times. Only two of twelve samples during this period did not exceed the NAL of 100mg/L.

## I.   Unauthorized Non-Storm Water Discharges from the PTS Facility in Violation of the General Industrial Permit Discharge Prohibition

337.   Plaintiffs are informed, believe, and thereon allege the PTS Facility has discharged unauthorized non-storm water discharges in violation of the General Industrial Permit. *See* 1997 Permit § A.1; 2015 Permit § III.B. For example, unauthorized non-storm water discharges occur at the Facility from the Facility's truck, vehicle, and bin washing activities.

338.   Plaintiffs are informed, believe, and thereon allege the PTS Owners and/or Operators conduct these activities without adequate BMPs to prevent related non-storm water discharges. Facility Owners and/or Operators state that the washing area contains a berm to prevent wash water from discharging, but information available to Coastkeeper and CERF indicates that vehicles and bins track some wash water out of this bermed area upon exiting, and that the Facility's other BMPs are insufficient to prevent related non-storm water discharges.

339.   Non-storm water discharges resulting from truck, vehicle, and bin washing activities do not qualify as authorized non-storm water discharges under the General

Industrial Permit.

340.   San Diego Regional Municipal Separate Storm Sewer System (MS4) Permit Section E.2.a. prohibits the discharge of unauthorized non-storm water as an illicit discharge. Wash water is not listed among the authorized non-storm water discharges. See MS4 Permit §§ E.2.a.3-4.

341.   Each time Defendants discharge prohibited non-storm water in violation of Discharge Prohibition III.B. of the Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Plaintiffs will update the number and dates of violations when additional information becomes available. Defendants are subject to civil penalties for all violations of the Clean Water Act occurring since May 22, 2014.

## V.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the General Industrial Permit's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

342.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

343.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators failed and continue to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

344.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

345.   The PTS Facility Owners and/or Operators' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Industrial Permit and the CWA. *See* 1997

Permit § B.3; 2015 Permit § I.D.32, V.A; see also 33 U.S.C. § 1311(b).

346.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators violated and continue to violate the General Industrial Permit Effluent Limitation each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the PTS Facility.

347.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have been in violation of the General Industrial Permit Effluent Limitation at the PTS Facility every day from May 22, 2014 to the present.

348.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators' violations of the General Industrial Permit Effluent Limitation and the Clean Water Act are ongoing and continuous.

349.   The PTS Facility Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

350.   Each day that Defendants operate the PTS Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

351.   Each day that Defendants operate the PTS Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

352.   By committing the acts and omissions alleged above, the PTS Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

353.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

354.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiffs pray judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of General Industrial Permit Receiving Water Limitations and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

355.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

356.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

357.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators discharge storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the PTS Facility.

358.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the PTS Facility.

359.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the PTS Facility.

360.   The PTS Facility Owners' and/or Operators' discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit §§ C.1-2; 2015 Permit §§ VI.A-B; *see also* 33 U.S.C. § 1311(b).

361.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators violated and will continue to violate the General Industrial Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, discharge from the PTS Facility.

362.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have been in violation of the General Industrial Permit Receiving Water Limitations every day from May 22, 2014 to the present.

363.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators' violations of the General Industrial Permit Receiving Water Limitations and the CWA are ongoing and continuous.

364.   The PTS Facility Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs is discharged from the PTS Facility.

365.   Each day that Defendants have discharged and/or continue to discharge polluted storm water from the PTS Facility in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

366.   By committing the acts and omissions alleged above, the PTS Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

367.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

368.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendants as set forth hereafter.

## THIRD CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the General Industrial Permit and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

369.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

370.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to develop and/or implement adequate SWPPPs for the Facility.

371.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to adequately revise the SWPPPs for the Facility.

372.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility and/or Operators conduct operations at the Facility each day without adequately developed, implemented, and/or revised SWPPPs.

373.   The PTS Facility Owners and/or Operators' failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit § A; 2015 Permit § X; *see also* 33 U.S.C. § 1311(b).

374.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have been in violation of the General Industrial Permit SWPPP requirements at the Facility every day from May 22, 2014 to the present.

375.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators' violations of the General Industrial Permit SWPPP requirements and the CWA at the Facility are ongoing and continuous.

376.   The PTS Facility Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately

develop, implement, and/or revise the SWPPPs for the Facility.

377. Each day that Defendants operate the PTS Facility without developing and/or implementing adequate SWPPPs is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

378. By committing the acts and omissions alleged above, the PTS Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

379. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

380. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendants as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring and Reporting Plans in Violation of the General Industrial Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

381. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

382. Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to develop and/or implement adequate M&RPs for the Facility.

383. Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to adequately revise the M&RPs for the Facility.

384.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators conducts operations at the Facility each day without adequately developed, implemented, and/or revised M&RPs.

385.   The PTS Facility Owners and/or Operators' failure to adequately develop, implement, and/or revise M&RPs for the Facility is a violation of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit §B; 2015 Permit § XI; *see also* 33 U.S.C. § 1311(b).

386.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have been in violation of the General Industrial Permit M&RP requirements every day from May 22, 2014 to the present.

387.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators' violations of the General Industrial Permit M&RP requirements and the CWA at the Facility are ongoing and continuous.

388.   The PTS Facility Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise M&RPs for the Facility.

389.   Each day that Defendants operate the PTS Facility without developing, implementing, and/or revising adequate M&RPs is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

390.   By committing the acts and omissions alleged above, the PTS Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

391.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

392.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendants as set forth hereafter.

## FIFTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the General Industrial Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

393.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

394.    Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to submit accurate and/or complete Annual Reports for the Facility.

395.    The PTS Facility Owners and/or Operators' failure to submit complete and accurate Annual Reports is a violation of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit §§ B.14, C.9-10; 2015 Permit § XVI; *see also* 33 U.S.C. § 1311(b).

396.    Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators conduct operations at the Facility each day without reporting as required by the General Industrial Permit.

397.    Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have been in violation of the General Industrial Permit's reporting requirements every day since at least May 22, 2014.

398.    Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators' violations of the reporting requirements of the General Industrial Permit and the CWA are ongoing and continuous.

399.    The PTS Facility Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to comply with the General Industrial Permit reporting requirements at the Facility.

400.    Each and every violation of the General Industrial Permit reporting

requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

401.   By committing the acts and omissions alleged above, the PTS Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

402.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

403.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendants as set forth hereafter.

## SIXTH CAUSE OF ACTION

**Failure to Properly Monitor in Violation of the General Industrial Permit**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

404.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

405.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to conduct the requisite visual observations of storm water discharges at the Facility.

406.   The PTS Facility Owners and/or Operators' failure to conduct the requisite visual observations at the Facility is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit §§ B.3-4; 2015 Permit § XI.A; *see also* 33 U.S.C. § 1311(b).

407.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to collect and analyze the required number of storm water samples the Facility.

408.   The PTS Facility Owners and/or Operators' failure to collect and analyze the

required number of storm water samples at the Facility is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit §§ B.5.a-b, 2015 Permit §§ XI.B.1-3; *see also* 33 U.S.C. § 1311(b).

409. Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail collect samples from each discharge location at the Facility.

410. The PTS Facility Owners and/or Operators' failure to collect samples from each discharge location at the Facility is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit § B.7; 2015 Permit §§ XI.B.4-5; *see also* 33 U.S.C. § 1311(b).

411. Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to analyze all collected samples for all required parameters.

412. The PTS Facility Owners and/or Operators' failure to analyze all collected samples for all required parameters is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit §§ B.5.c, B.6; 2015 Permit §§ XI.B.6, XI.D; *see also* 33 U.S.C. § 1311(b).

413. Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed to comply with the General Industrial Permit's monitoring requirements at the Facility since May 22, 2014.

414. Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators' violations of the General Industrial Permit monitoring requirements and the Clean Water Act are ongoing and continuous.

415. The PTS Facility Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to comply with the General Industrial Permit's monitoring.

416. Each and every violation of the General Industrial Permit's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C.

§ 1311(a).

417.   By committing the acts and omissions alleged above, the PTS Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

418.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

419.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendants as set forth hereafter.

## SEVENTH CAUSE OF ACTION

**Failure to Comply with ERA Requirements in Violation of the
General Industrial Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

420.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

421.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to conduct adequate Level 1 ERA status evaluations for the Facility.

422.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have failed and continue to fail to submit adequate Level 1 ERA Reports for the Facility.

423.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators conduct operations at the Facility each day without conducting adequate Level 1 ERA status evaluations and/or without submitting adequate Level 1

ERA Reports.

424.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators' failure to conduct adequate Level 1 evaluations and/or failure to file adequate Level 1 ERA Reports is a violation of the General Industrial Permit. 2015 Permit, § XII(C).

425.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit Level 1 status evaluation requirements every day since at least October 1, 2016.

426.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit Level 1 status ERA reporting requirements every day since at least January 1, 2017.

427.   The PTS Facility Owners and/or Operators will continue to be in violation of the General Industrial Permit and the CWA each and every day the PTS Facility Owners and/or Operators fail to comply with the Level 1 ERA requirements.

428.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators violations of the Level 1 ERA requirements of the General Industrial Permit and the CWA are ongoing and continuous.

429.   Every day the PTS Facility Owners and/or Operators conduct operations at the PTS Facility without conducting an adequate Level 1 status evaluation and/or a without submitting an adequate Level 1 ERA Report, is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

430.   By committing the acts and omissions alleged above, the PTS Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the Level 1 status evaluation requirements occurring from October 1, 2016, to the present, and for each and every violation of the Level 1 ERA Report

requirements occurring from January 1, 2017, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

431.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

432.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendants as set forth hereafter.

## EIGHTH CAUSE OF ACTION

### Discharges of Unauthorized Non-Storm Water in Violation of the General Industrial Permit and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

433.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

434.   Plaintiffs are informed and believe, and thereon allege, that prohibited non-storm water discharges have discharged and continue to discharge from the PTS Facility.

435.   The PTS Facility Owners and/or Operators' failure to prevent unauthorized non-storm water discharges is a violation of the General Industrial Permit and the CWA. 1997 Permit § A.1; 2015 Permit § III.B; 33 U.S.C. § 1311(a).

436.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators violated and will continue to violate the General Industrial Permit Discharge Prohibition each and every time unauthorized non-storm water discharges from the Facility.

437.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility Owners and/or Operators have been in violation of the General Industrial Permit Discharge Prohibition every day from May 22, 2014 to the present.

438.   Plaintiffs are informed and believe, and thereon allege, that the PTS Facility

Owners and/or Operators' violations of the General Industrial Permit are ongoing and continuous.

439.   Each and every violation of the General Industrial Permit Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

440.   By committing the acts and omissions alleged above, the PTS Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 22, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

441.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

442.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendants as set forth hereafter.

## VI.   <u>RELIEF REQUESTED</u>

443.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A Court order declaring the Defendants to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the PTS Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, and for failing to comply with the substantive and procedural requirements of the General Industrial Permit;

b.   A Court order enjoining Defendants from discharging pollutants without a NPDES permit;

c.   A Court order requiring Defendants to implement affirmative injunctive

measures designed to eliminate Defendants' violations of the substantive and procedural requirements of the General Industrial Permit and the Clean Water Act;

d.      A Court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per day per violation for all CWA violations after January 12, 2009, and $54,833.00 per day per violation for violations that occurred after November 2, 2015, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

e.      A Court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.      Any other relief as this Court may deem appropriate.

Dated: May 22, 2019

Respectfully submitted,

COAST LAW GROUP LLP


By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com


SAN DIEGO COASTKEEPER


By: s/Matt O'Malley
MATT O'MALLEY
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: matt@sdcoastkeeper.org